**UNITED STATES of America, Plaintiff,**

v.

**Charles L. GARAVAGLIA, Defendant.**

**No. 96–CR–80290.**

United States District Court,
E.D. Michigan,
Southern Division.

April 9, 1998.

---

Craig Weier, Assistant United States Attorney, Detroit, MI, for Plaintiff.

Joseph Falcone, Southfield, MI, Brian M. Legghio, Sterling Heights, MI, for Defendant.

## ORDER

JULIAN ABELE COOK, Jr., District Judge.

On April 10, 1996, the Plaintiff, United States of America (Government), filed a mul-

tiple count Indictment against the Defendant, Charles L. Garavaglia, alleging, *inter alia,* that he had been involved in an elaborate scheme of fraudulent activity.[1] One year later, on April 23, 1997, Garavaglia tendered a plea of guilty to committing mail fraud (Count 6 to the Indictment), in violation of 18 U.S.C. § 1341, and conspiring to defraud the federal government (Count 11 to the Indictment), in violation of 18 U.S.C. § 371, pursuant to his agreement with the Government under Fed.R.Crim.P. 11. At the conclusion of the hearing, the Court took his plea under advisement. On September 17, 1997, the Court accepted Garavaglia's guilty plea, along with the Rule 11 plea agreement.[2]

On December 11–12, 1997, the Court conducted an evidentiary hearing to determine the amount of restitution, if any, that would be imposed against Garavaglia for his criminal activity.[3] At the invitation of the Court, both parties thereafter submitted written briefs which addressed the issue of restitution. Although the restitution issue is currently ripe for disposition, Garavaglia has now filed two separate motions, in which he seeks to withdraw his guilty plea and obtain the dismissal of the indictment. The spark that ignited these motions is a recent decision by the Sixth Circuit Court of Appeals, namely, *United States v. Alexander Ovalle,* 136 F.3d 1092 (6th Cir.1998), which found the Jury Selection Plan of the Eastern District of Michigan to be violative of the Jury Selection and Service Act, 28 U.S.C. § 1861, et seq., and the Fifth Amendment to the United States Constitution. The Government has expressed its opposition to these motions.

I.

A. Motion to Withdraw Guilty Plea

Federal Rules of Criminal Procedure 32 governs the circumstances under which a

---

1. Garavaglia was charged with nineteen (19) counts of criminal activity, including: mail fraud, in violation of 18 U.S.C. § 1341 (Counts 1–10); conspiracy to defraud the federal government, in violation of 18 U.S.C. § 371 (Count 11); making and subscribing a false (i) individual income tax return, in violation of 26 U.S.C. § 7206(1) (Counts 12–14), and (ii) corporation tax return, in violation of 26 U.S.C. § 7206(1) (Count 15 & 16); willful failure to file heavy vehicle use tax form 2290, in violation of 26 U.S.C. § 7203 (Counts 17–19).

2. The Court indicated on the record that it was fully satisfied that Garavaglia had knowingly, freely, and voluntarily offered his plea of guilty to the subject offenses.

3. Prior to the commencement of the evidentiary hearing, Garavaglia filed several other motions, all of which were taken under advisement by the Court.

defendant may withdraw a plea of guilty prior to the imposition of a criminal sentence. In relevant part, Rule 32(e) provides:

Plea Withdrawal. If a motion to withdraw a plea of guilty ... is made before sentence is imposed, the court may permit the plea to be withdrawn if the defendant shows any fair and just reason.

 It bears noting that criminal defendants lack an absolute right to withdraw presentence guilty pleas. *United States v. Kirkland,* 578 F.2d 170, 172 (6th Cir.1978). Indeed, criminal defendants bear the burden of establishing a "fair and just reason" for Rule 32 relief. *United States v. Bazzi,* 94 F.3d 1025 (6th Cir.1996). Nonetheless, it is within the sound discretion of the court to grant or deny such requests. *Id.,* 578 F.2d at 172. In evaluating whether any "fair and just reason" exists to withdraw or set aside a guilty plea, the Sixth Circuit has instructed courts to weigh the following factors:

(1) the amount of time that elapsed between the plea and the motion to withdraw it;

(2) the presence (or absence) of a valid reason for the failure to move for withdrawal earlier in the proceedings;

(3) whether the defendant has asserted or maintained his innocence;

(4) the circumstances underlying the entry of the guilty plea;

(5) the defendant's nature and background;

(6) the degree to which the defendant has had prior experience with the criminal justice system; and,

(7) potential prejudice to the government if the motion to withdraw is granted.

*United States v. Bashara,* 27 F.3d 1174, 1181 (6th Cir.1994); *see also United States v. Spencer,* 836 F.2d 236, 239–40 (6th Cir.1987).

 Here, despite Garavaglia's assertions to the contrary, the Court accepted his plea, as well as the underlying Rule 11 plea agreement, on September 17, 1997. Garavaglia

had initially entered his plea on April 23, 1997. At that time, the Court engaged in an exhaustive allocution with Garavaglia concerning his plea of guilty. In accordance with Fed.R.Crim.P. 11, the Court inquired into the factual basis for his guilty plea.[4] The record reveals Gavaraglia's assignment of factual guilt as to Counts 6 (mail fraud) and 11 (conspiracy to defraud) at the hearing.

Immediately following the Government's recitation of the facts underlying Counts 6 and 11 (Plea Transcript, 4/23/97, at 25–27), the Court inquired of Garavaglia:

THE COURT: Mr. Garavaglia, did you hear [the Assistant United States Attorney's] recitation of what, in his judgment, the Government would be able to prove against you as it relates to Counts 6 and 11 of the indictment?

DEFENDANT: Yes, Your Honor.

THE COURT: Do you accept his statements as being correct?

DEFENDANT: Yes, Your Honor.

THE COURT: Are there any modifications that you wish to make to [the Assistant United States Attorney's] representation?

DEFENDANT: No, Your Honor.

(*Id.* at pp. 27–28).

With regard to the claim of mail fraud (Count 6), Garavaglia set forth the following factual basis in support of his guilty plea:

DEFENDANT: Your Honor, I got involved with a CPA and two of his sons, who planned a program to reduce ... reported monthly amounts to the insurance company.... It gave the company cash flow to operate the business.... In March 1992 ... I signed a tax return ... which had—and ultimately reported to me by the Yarnells that they misstated—they advised me that they misstated that tax year the workers' compensation premium.... They told me that. I understood it and I signed the tax return.

---

4. Subsection (f) of Rule 11 provides that "the court should not enter a judgment upon (a guilty) plea without making such inquiry as shall satisfy it that there is a factual basis for the plea." The Advisory Committee's Notes to Rule 11(f) (1974

Amendment) suggests that "(a)n inquiry might be made of the defendant, of the attorneys for the government and the defense, of the presentence report when one is available, or by whatever means is appropriate in a specific case."

The Court then engaged Garavaglia in the following colloquy:

THE COURT: With regard to the workers' compensation insurance policies, if your estimate was too high, then your company would receive a refund?

DEFENDANT: That's correct, Your Honor.

THE COURT: And did your company receive a refund?

DEFENDANT: No, Your Honor.

THE COURT: And why did it not, to your knowledge?

DEFENDANT: Because it was underreported when they put the figures in.

THE COURT: Your company was then required to pay the difference?

DEFENDANT: The company would have been obligated to pay the difference, that's correct, Your Honor.

THE COURT: Did you know that by utilizing this practice on behalf of your company, that it was wrong?

DEFENDANT: In the end, I knew it was wrong, Your Honor, yes.

\*　　\*　　\*　　\*　　\*　　\*

THE COURT: So that we can define—you say the words "at the end." What ...

DEFENDANT: When the tax return was brought to me to sign for the business in 1991, the number that was down on the reported expense of workmen's compensation was a number larger than what I know that I had signed a check for ...

THE COURT: Did you take steps to correct that figure?

DEFENDANT: That year.

THE COURT: Yes.

DEFENDANT: The company closed then, Your Honor.

Following this exchange, the Court asked Garavaglia to state the factual basis that would support his plea of guilty as to the conspiracy charge (Count 11).

DEFENDANT: I knew when I then signed the tax return that the numbers were not correct, which changed the, I guess the proper word is the liability for tax purposes. Yes, I knew it at that time.

THE COURT: The word "conspiracy" suggests or implies that there were other persons involved in the criminal activity.

DEFENDANT: The three Yarnells, Your Honor, the one that was partial owner, who claimed to be a CPA, and there two sons that he represented were the accountants.

In addition to these procedural safeguards, the Court inquired of Garavaglia whether he had been induced or coerced into offering his plea of guilty.[5] Garavaglia answered in the negative. Garavaglia also signed a "Guilty Plea Questionnaire," in which he set forth the factual basis for his guilty pleas to Counts 6 and 11. He likewise signed a Rule 11 plea agreement which also set forth his factual

---

**5.** The Court engaged in the following colloquy with Garavaglia:

THE COURT: Is your plea of guilt freely, understandingly and voluntarily made by you?

DEFENDANT: Yes, sir.

THE COURT: Have you been induced or persuaded to offer this plea of guilt because of any statements by anyone that I would treat you with greater leniency if you pled guilty then if you did not plead guilty?

DEFENDANT: No, Your Honor.

　\*　　\*　　\*　　\*　　\*　　\*

THE COURT: Do you know of anything that would impair or tend to impair your ability to fully and completely understand the nature of the charges that are presently pending against you?

DEFENDANT: No, sir.

THE COURT: Do you know of anything that would impair or tend to impair your ability to

fully and completely understand the questions that I've posed to you today?

DEFENDANT: No, sir.

　\*　　\*　　\*　　\*　　\*　　\*

THE COURT: Are you pleading guilty because you believe it to be in your best interest?

DEFENDANT: Yes, Your Honor.

THE COURT: Are you pleading guilty because you are guilty?

DEFENDANT: Yes, Your Honor.

THE COURT: Have you thoroughly understood all of the questions that I've asked of you today?

DEFENDANT: Yes, sir.

(Plea Transcript, 4/23/97, pp. 34–37).

The Court also fully apprised Garavaglia of the consequences of plea, including waiver of a trial by jury. (Id. at pp. 516–517).

guilt. (Plea Agreement at pp. 2–3). Throughout the entire plea proceedings, Garavaglia was represented by able counsel, who indicated his satisfaction with the plea.

On September 17, 1997, the Court, having been fully satisfied that Garavaglia's offer of factual guilt was freely, voluntarily and intelligently made by him, accepted his guilty plea. In so doing, the Court concluded that Garavaglia had also "knowingly, intelligently and understandingly waived his [constitutional] rights for purposes of the guilty plea." The Court, in turn, accepted the Rule 11 Plea Agreement as "reasonable and appropriate under the circumstances." Despite having lodged several objections to the Presentence Investigation Report (PSR), Garavaglia never expressed any interest or desire to withdraw his guilty plea.

On March 23, 1998, Garavaglia filed a motion to withdraw the guilty plea which he entered on April 23, 1997. Garavaglia asserts that he filed the motion as soon as practicable, i.e., after notice of the publication of the *Ovalle* decision. In *Ovalle*, the Sixth Circuit determined that the jury selection system, which had been adopted by the judges of this district, unconstitutionally excluded non-African Americans from grand and petit jury service on the basis of race.

In his pleading papers, Garavaglia maintains that, prior to March 17, 1997, he was unaware of the existence of any constitutional challenge to the racial composition of the grand jury that indicted him. He argues that it would have been futile for him to raise the issue earlier in the proceedings since "the case law was against him." Furthermore, Garavaglia asserts that his counsel was ineffective for not having raised the issue (to wit, grand jury discrimination) sooner.[6] It is Garavaglia's contention that he should not be deemed to have knowingly and intelligently waived his right "to be indicted by a constitutionally selected Grand Jury" since he was unaware of the existence of such a claim. In addition, he submits that there has been no

"meeting of the minds" between the parties with regard to the Rule 11 plea agreement. In support of this contention, he maintains, among other things, that the Government calculated his sentence through the use of improper sentencing guidelines. He also asserts that he was induced to enter a guilty plea by repeated threats of the Government to indict his wife. (Deft. Motion to Withdraw Plea at 4). It is his position that he engaged in the alleged criminal activity as a result of entrapment. Consequently, he claims that his plea of guilty was made under " 'some mistake or misapprehension.' " The Court disagrees.

■ Garavaglia filed this motion on March 23, 1998 more than 300 days after his initial plea of guilty on April 23, 1997. Since his plea, Garavaglia has appeared before this Court on several different occasions. During those times, he has consistently articulated his desire to maintain his guilty plea. The Sixth Circuit has recognized that the "aim of [Rule 32] is to allow a hastily entered plea made with unsure heart and confused mind to be undone, not to allow a defendant 'to make a tactical decision to enter a plea, wait several weeks and then obtain a withdrawal if he believes he has made a bad choice in pleading guilty.' " *United States v. Baez*, 87 F.3d 805, 808 (6th Cir.1996) (quoting *United States v. Alexander*, 948 F.2d 1002, 1004 (6th Cir.1991)).

Garavaglia cannot seriously argue that he "hastily" entered into his plea which was offered by him on April 23, 1997, and accepted by the Court on September 17, 1997. Furthermore, he had a year, in which to contemplate whether to offer his guilty plea. As is evident from the record, his decision to plead guilty was well advised under the circumstances. Nevertheless, Garavaglia asserts his innocence to the charged offenses.

Notwithstanding Garavaglia's contention that he was induced to enter a plea of guilty by threats of the Government to indict his wife, the record clearly contradicts this as-

---

6. *Garavaglia is represented by two attorneys in this cause, namely, Brian M. Legghio and Joseph Falcone. Legghio represented Garavaglia during the plea proceedings. The record is silent as to Falcone's involvement, if any, in the pre-sen-* tencing proceedings. Presumably, Garavaglia is challenging the quality of representation that was afforded to him by Legghio since Falcone filed the instant motion.

sertion. Further, given the seriousness of this claim, the Court finds it odd that Garavaglia did not voice this objection at an earlier date, on his own or through counsel. Aside from his conclusory assertion, Garavaglia has failed to provide the Court with any factual basis upon which to support this claim.

Garavaglia also asserts an entrapment defense to the criminal activity for which he pled guilty. He submits that he has "protested his innocence" in this case. It is his contention that a jury could find him innocent. The Court is fully satisfied that Garavaglia established his factual guilt to the charged offenses during the plea allocution. *See Blackledge v. Allison*, 431 U.S. 63, 64, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977) (defendant's sworn statements during plea allocution "carry a strong presumption of verity"). Garavaglia, in no uncertain terms, admitted his guilt to Counts 6 and 11. Hence, the Court finds his claims of innocence to be totally unavailing for purposes of Rule 32.

Garavaglia alleges that he filed this motion as soon as he learned of the *Ovalle* decision. In light of *Ovalle*, he attacks the validity of his plea, arguing that he had not "knowingly and intelligently waived his right to be indicted by a constitutionally selected grand jury." (Deft. motion to Withdraw Plea at pp. 3–4). Furthermore, he alleges that his counsel failed to adequately advise him about this particular objection to the indictment.

■■■ The *Ovalle* decision, in and of itself, does not establish cause for the tardy submission of this motion. In April of 1993, the

*Ovalle* defendants attacked the jury selection plan which had been implemented by this district in 1992. Although their claims were ultimately rejected by the district judge, this ruling did not establish a precedent within this district. Thus, Garavaglia could have asserted his own challenge to the racial composition of the grand jury that indicted him on April 10, 1996. He failed to do so. Instead, he offered a plea of guilty on April 23, 1997. Once he entered this plea, Garavaglia waived his right to challenge any non-jurisdictional defects to the indictment (including, his present claim of grand jury discrimination), under Fed.R.Crim.P. 12(b)(2).[7] Rule 12(f) of the Federal Rules of Criminal Procedure prescribes this result. Nonetheless, courts may grant relief from a Rule 12(b)(2) waiver for "cause shown." Fed.R.Crim.P. 12(f). In this circuit, Garavaglia must establish "cause and actual prejudice" in order to avail himself of the waiver requirement. *Ovalle*, at 1107 (citing *United States v. Oldfield*, 859 F.2d 392, 397 (6th Cir.1988)).

■■■ As previously stated, Garavaglia could have initiated an independent challenge to the grand jury selection process. He did not. Therefore, he challenges the knowing and voluntary character of his plea by suggesting that he was denied the effective assistance of counsel. Aside from this assignment of error (to wit, failure to object to the grand jury composition), Garavaglia has not challenged the competency of his counsel or the voluntariness of his plea. Significantly, he does not argue that but for this alleged error, he would have rejected the plea.[8]

---

7. Pursuant to Rule 12(b)(2), "defenses and objections based on defects in the indictment or information ..." must be raised prior to trial or the entry of a guilty plea. The Advisory Committee's Notes (1940 Adoption) indicate that a defense or objection to the "illegal selection or organization of the grand jury" is waived unless timely asserted under Rule 12(b)(2). *See also Poliafico v. United States*, 237 F.2d 97, 110 (6th Cir.1956) ("motion challenging the method of impanelling a grand jury must be made before the plea is entered," under Fed.R.Crim.P. 12); *Shotwell Manufacturing Company v. United States*, 371 U.S. 341, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963) (Fed.R.Crim.P.12(b)(2) governs objections to grand jury composition);

8. In *Hill v. Lockhart*, 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985), the Supreme Court artic-

ulated the standard for establishing that ineffective assistance of counsel resulted in an involuntary plea as follows:

> "Where ... a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice 'was within the range of competence demanded of attorneys in criminal cases.'"

Id. at 56, 106 S.Ct. 366 (quoting *McMann v. Richardson*, 397 U.S. 759, 771, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)).

Given the strong evidence of criminal activity in this case, Garavaglia, through close assistance of counsel, was able to obtain major concessions from the Government, as reflected in the Rule 11 plea agreement. Throughout these proceedings, Brian M. Legghio, a skilled defense attorney, has

Further, Garavaglia has failed to demonstrate that he has been actually prejudiced by (a) the representation of his attorney, or (b) the waiver requirement. Consequently, the Court must reject Garavaglia's efforts to attack the knowing and voluntary nature of his guilty plea.[9]

In its pleading papers, the Government correctly notes that this case is in the sentencing phase. Notwithstanding various adjournments, the Court has accepted and entered Garavaglia's plea of guilty, along with the Rule 11 plea agreement. In addition, the Court has resolved a variety of his objections to the Presentence Investigation Report. Garavaglia has had an opportunity to evaluate these rulings, some of which have been adverse to him. With full recognition that he is scheduled to be sentenced for his criminal activity on April 9, 1998, Garavaglia has nonetheless asked this Court to withdraw his plea. If the Court were to grant such a request, it would cause enormous prejudice to the Government.

Two years have already elapsed since the grand jury returned the original indictment against Garavaglia, who had no prior history of criminal activity. The Government has indicated that if Garavaglia's request to withdraw his plea is granted by this Court it will have great difficulty in locating the key witnesses in this case, all of whom were available to testify against Garavaglia.[10] The Government also maintains that if Garavaglia is permitted to retract his guilty plea, it would be required to employ significant resources to prosecute this case anew. Under these circumstances, the Government advances a compelling claim of prejudice, which Garavaglia has failed to refute.

Inasmuch as Garavaglia had failed to assert a "fair and just reason" which would justify the withdrawal of his guilty plea, his Rule 32 motion is denied.[11]

### B. Motion to Dismiss Indictment

On March 17, 1998, Garavaglia filed a motion, in which he seeks to obtain a dismissal the federal indictment that was issued against him under Fed.R.Crim.P. 12(b)(2) and 12(f).[12] Garavaglia challenges the racial composition of the grand jury that indicted him. It is his contention that the selection of the grand jury violated the Jury Selection and Service Act, 28 U.S.C. § 1861, et seq., and his rights as secured by the Fifth and Sixth Amendments to the United States Constitution. In support of his motion, Garavaglia relies primarily, if not exclusively, on the *Ovalle* decision. In fact, he merely incorporates by reference the arguments that were advanced by the defendants in the *Ovalle* case.

Garavaglia maintains that he entered into the Rule 11 plea agreement with the Government on the mistaken belief that the composition of the grand jury was "constitutionally valid." Moreover, Garavaglia maintains that he did not become aware of the "defect" in the grand jury selection process until March 17, 1998—the filing date of his motion. As a result, it is his argument that to the extent that he has waived any objection to grand

bargained for, and won, favorable terms for his client. Arguably, had Garavaglia, through his counsel, successfully raised his claim of grand jury discrimination, it would have merely delayed "the inevitable date of prosecution." *Tollett v. Henderson*, 411 U.S. 258, 268, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973); *see also Ovalle*, 136 F.3d at 1098 n. 8. Notwithstanding the grand jury composition, there was sufficient evidence to indict Garavaglia on the charged offenses. Thus, in the context of this particular case, counsel's advice was within the range of competence demanded of attorney's in criminal cases.

9. Based on the plea allocution, this Court has no reason to doubt that Garavaglia's plea was knowing and voluntary.

10. The Government asserts that at least one of the case agents who investigated the criminal activity of Garavaglia has retired from duty. Also, another case agent has been transferred to different governmental agency.

11. Even though Garavaglia claims that the parties have failed to reach a "meeting of the minds" with regard to the Rule 11 plea agreement, this assertion is unsupported by the record in this cause. He has highlighted certain issues (such as, a discrepancy involving tax loss), which can easily be resolved at the time of sentencing.

12. On April 6, 1998, Garavaglia filed a supplemental response, in which he asserts that Fed. R.Crim.P. 32(e) governs the disposition of this issue. As stated in Section I.A, Rule 32(e) governs motions to withdraw guilty pleas.

jury composition, it should be "excused" by the Court.

In its opposition papers, the Government submits that, by virtue of his guilty plea, Garavaglia has waived any objection to the racial composition of the grand jury. In support of its position, the Government relies primarily upon the decision by the Supreme Court in *Tollett v. Henderson,* 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973).

*Tollett* involved a collateral attack on the validity of a guilty plea by a state prisoner who sought to challenge the racial composition of the grand jury that indicted him. The prisoner entered his guilty plea without raising an objection to the grand jury composition. Notwithstanding the existence of a "claimed antecedent constitutional violation," the Supreme Court concluded that "the focus of federal habeas inquiry is the nature of the advice and the voluntariness of the plea." Id. at 266, 93 S.Ct. 1602.

 Although *Tollett* arose in the context of a collateral proceeding, this Court finds the following language to be instructive:

[A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea.

Id. at 267, 93 S.Ct. 1602.

In this case, Garavaglia has entered his plea, and is currently awaiting sentencing. Therefore, unless he can demonstrate that his plea was involuntary and unknowing, Garavaglia cannot assert a nonjurisdictional challenge to the indictment. *See United States v. Zarbano,* 1992 WL 395595, at *10 (S.D.N.Y.) (nonjurisdictional challenges are waived by knowing and voluntary guilty plea). The Court has found that Garavaglia knowingly and voluntarily entered into his plea. Therefore, he has not established any defect with his guilty plea.

Accordingly, his motion must be denied.[13]

## C. Restitution

The Rule 11 plea agreement in this case incorporated, among other things, a bargain between the parties concerning the amount of restitution, if any, which would be paid by Garavaglia. In pertinent part, the plea agreement provided as follows:

[T]he Court ... may order defendant to pay restitution, relative to the tax fraud charges, in an amount equal to the tax loss, including interest and penalties ... and, with respect to the insurance fraud charges, in an amount equal to the loss caused to any victims of the offenses charged in the indictment.

The parties agree that the tax loss resulting from the charged tax offenses may be at least $207,000, which amount the defendant promises to pay prior to sentencing. The parties agree further that the fraud loss in this case will be determined by the court, and that the court may order restitution in that amount, but the parties agree that said amount will, in no event, exceed $500,000.

(Plea Agreement at ¶ 2, § 3).

Garavaglia maintains that none of the workers' compensation insurance companies,

---

**13.** For the reasons that were stated in Section I.A, Garavaglia cannot avail himself of Fed. R.Crim.P. 12(b)(2) and (f). Indeed, he has neither shown cause for his failure to object nor demonstrated any actual prejudice from the waiver requirement.

This result is buttressed by *Davis v. United States,* 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973), which was decided on the same date as *Tollett.* In *Davis,* the Supreme Court held that, for purposes of collateral attack, a federal prisoner had waived his objection to the composition of the grand jury because he failed to raise the issue before entry of his plea as required by Fed.R.Crim.P. 12(b)(2). In so ruling, the Court concluded that "the waiver standard expressed in Rule 12(b)(2) governs an untimely claim of grand jury discrimination, not only in the criminal proceeding, but also later on collateral review." Id. at 242, 93 S.Ct. 1577.

Even though three justices (Marshall, Douglas and Brennan) argued in their dissent that an untimely claim of grand jury discrimination should be heard if a defendant can show that his failure to object was not " 'an intentional relinquishment or abandonment of a known right or privilege,' " Id. at 245, 93 S.Ct. 1577 (Marshall, dissenting opinion) (quoting *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)), the majority did not adopt such a view.

which provided coverage to his companies, suffered any loss as a result of his alleged underpayment of insurance premiums. The Government vehemently disagrees.

 In evaluating this issue, the Court will consider the amount of loss that any victim suffered as a result of Garavaglia's criminal activity, along with his financial needs and resources. *See* 18 U.S.C. § 3664(e). The United States Sentencing Guidelines authorize federal courts to make a reasonable estimate of the loss which is occasioned by the criminal activity of a defendant where the precise amount of restitution is difficult to approximate. U.S.S.G. § 2F1.1, Application Note 8 (1991). Thus, the Court will base its findings with regard to this issue on the preponderance of the evidence standard. *See* 18 U.S.C. § 3664(e); *see also United States v. Carroll,* 893 F.2d 1502 (6th Cir.1990) (preponderate of evidence standard typically governs sentence guidelines issues). Although both parties have submitted various types of documentary evidence, the Court will only give weight to the information that has a "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a) (1991).

 In its pleading papers, the Government asserts that the insurance companies are entitled to the "benefit of their bargain with the entities owned by, under the control of or from which the defendant derived significant income." The Government explains that the insurance companies issued policies which covered "all" of the employees within Garavaglia's business entities. However, Garavaglia, through his business entities, "substantially understated" payroll expenditures to the insurance companies. As a result, the business entities lowered the amount of insurance premiums which had to be paid to the insurance companies, who based its premiums on the reported payroll. The Government posits that Garavaglia's business entities "received something considerably more valuable than the amount they paid," and, thus, the insurance companies are entitled to difference between the amount of insurance premium actually paid and that which should have been paid.

Based upon this theory, the Government claims that the Court could order Garavaglia to pay restitution in the amount of $3,268,-625.[14] This figure represents the amount of insurance premium underpaid to the insurance companies between December 1, 1990 and June 27, 1993.[15] To support this theory of restitution, the Government relies primarily upon an audit that was performed by Thomas Tokarek (Tokarek Audit). The Defendant challenges the Tokarek Audit.

### 1. Nature of Business

During the period in question (December 1, 1990 and June 27, 1993), Garavaglia operated several employee leasing businesses that catered to the trucking industry.[16] Spe-

14. The Government also advances an alternative theory of restitution based upon the actual "out of pocket" losses of the insurance companies. Under this theory, restitution would be calculated by considering the value of the workers' compensation claims paid in excess of the premium that was collected by the insurance companies. The Government claims that, after December 1, 1990, the insurances companies paid "$1,510,-347 more in claims that it collected in premium." However, the Government acknowledges that it is "virtually impossible to quantify the claim attributable to the fraud."

15. In 1990, Congress amended the Victim and Witness Protection Act (VWPA), to expand the definition of a "victim" to include "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." *See United States v. Streebing,* 987 F.2d 368, (6th Cir., 1993), *cert. denied* 508 U.S. 961, 113 S.Ct. 2933, 124 L.Ed.2d 683 (discussing amendment to VWPA). The amendment, which became effective November 29, 1990, permitted restitution for a victim of an "offense that involves as an element a scheme, a conspiracy, or a pattern of criminal activity." Since this amendment lacks retroactive application, *Streebing,* 987 F.2d at 370, the Government correctly seeks a calculation of fraud loss beginning December 1, 1990.

16. Garavaglia owned or controlled the following companies Branch International, Inc. and BIS, Inc., during the three year period. On December 8, 1997, Garavaglia filed a motion in which he asks the Court not to consider testimony or evidence regarding his interests with BIS, Inc. He argues that such evidence is not relevant to the issue of restitution. However, he acknowledges that the parties agreed that the Court could consider "relevant conduct" for purposes of sentencing.

cifically, trucking companies were able to contract or lease truck drivers and other personnel from his businesses. On a monthly basis, his companies would bill its clients (the trucking companies) for their use of the leasing service. Each bill would set forth, by category of worker (e.g., driver, mechanic, office), the amount of fees that were to be paid for the personnel leasing service. Among other things, the bill would advise the trucking companies of the amount to be paid for workers compensation insurance. The trucking companies, in turn, would forward the workers compensation premiums to Garavaglia. His companies would then understate the payroll expenditure (for each worker classification) to the insurance companies.[17] Based on the payroll information, the insurance companies would estimate a lower premium rate for workers compensation coverage. Under such an arrangement, Garavaglia's companies would pay the lower premium rate from the funds that were collected from the trucking companies, and keep the difference.[18]

### 2. Tokarek Audit

The Government requested Thomas Tokarek to conduct an audit that would reasonably estimate the amount of insurance premiums which should have been paid by Garavaglia to the insurance companies.[19] Tokarek relied upon the billing records of Garavaglia's clients to estimate the payroll which should have been reported to the insurance companies. (Government's Response to Garavaglia's Memoranda [sic]

Regarding Restitution to the Insurance Companies, Attachment 4).

Relying upon the classification code for truck drivers (7208), Tokarek calculated the premium which, in his judgment, reasonably could have been collected from Garavaglia's clients during the relative period of insurance coverage. Tokarek then subtracted this amount from the premium figure that had been calculated by the insurance companies by using Garavaglia's false payroll information. The difference between the two premium figures represented the amount that was underpaid by Garavaglia.[20] Based upon this audit, the Government claims that the payroll figures were understated by as much as eighty to ninety percent.

Garavaglia asserts that the Tokarek Audit is unreliable. He claims, among other things, that Tokarek failed to use the proper workers compensation classification code for truck drivers. Likewise, Garavaglia claims that Tokarek did not properly consider the state of classification for each client. Also, he alleges that Tokarek failed to consider per diem expenses, equipment rental, overtime compensation. In addition, Garavaglia maintains that the employees from Branch International should not have been calculated within the payroll of BIS, Inc.

Tokarek has responded to most, if not all, of the objections that have been raised by Garavaglia (Id., Attachment 4). His response highlights a small margin of error relative to the premium calculations.[21] However, these assertions fail to undercut, in a significant way, the general reliability and

Inasmuch as the parties also agreed that the Court may consider "relevant conduct" for purposes of restitution, the Court will examine evidence concerning Garavaglia's interests in BIS, Inc., for the period in question. (*See* Plea Agreement, §§ 2(h), 4; *see also, supra,* n. 15). Thus, his request is denied.

**17.** The following insurance companies issued worker compensation coverage to Garavaglia's companies: Cigna/Insurance Companies of North America, Wausau Insurance Companies and Liberty Mutual Insurance Companies.

**18.** In the Indictment, the Government claimed that Garavaglia, along with his business partners, engaged in this criminal activity over a five year period, from 1988 to 1993.

**19.** Tokarek is employed as a field auditor for the Liberty Mutual Insurance Company.

**20.** The Government has attached a compilation of these tabulations to its brief. (Government's Response, Attachment 2). The chart lists each company and insurance carrier which was affected by this scheme during the relative time period.

**21.** Tokarek acknowledges that he used an improper workers compensation code. However, he supplemented his audit by taking this error into account. (Government's Response, Attachment 4).

trustworthiness of the audit. Even though Garavaglia suggests that no loss has been suffered by the insurance companies, the Tokarek Audit proves otherwise.[22] The Court finds that the Tokarek Audit sufficiently establishes a reasonable estimate as to the amount of insurance premium which Garavaglia's companies should have paid to the insurances companies.[23]

### 3. Finding

The Government estimates the loss at $3,268,625. However, to account for any margin of error,[24] the Court will construe Tokarek's calculations in a light most favorable to Garavaglia. Thus, the Court will assume that the amount of premium paid to the insurance companies ($381,173) was based on twenty percent of the actual payroll of Garavaglia's companies. Therefore, under the "benefit of the bargain" theory of restitution, a reasonable estimate of the loss suffered by the insurance companies as a result of the fraudulent activity of Garavaglia's companies would be $1,905,865 (i.e., five times the rate of premium paid to the three insurance companies).

The Court has previously accepted the Rule 11 plea agreement, which contains a $500,000 cap on restitution damages. Although the amount of loss reasonably exceeds $500,000,[25] the Court will not impose restitution in excess of this amount. Accordingly, restitution, in the amount of $500,000, shall be paid by Garavaglia forthwith.

### II.

Accordingly, for the reasons that have been stated hereinabove, Garavaglia's mo-

tions shall be, and are, denied, except that the amount of his restitution to the victims of his criminal acts shall be limited to the sum of five hundred thousand dollars ($500,000).

IT IS SO ORDERED.

**22.** Contrary to the strong record of criminal activity, Garavaglia would have this Court to believe that no loss was suffered by the insurance companies. Alternatively, he claims that the insurance companies have settled their claims against him. These assertions are without factual support.

**23.** Even though Garavaglia argues that employees of Branch International should not have been counted on the BIS, Inc., payroll, after May 8, 1991, sufficiently reliable evidence was presented to justify such an inclusion. (*See generally* Government Response, Attachment 4 and 6, pp. 1–3). Furthermore, the Court finds Tobarek's reliance

upon the Wausau information to be reasonable. (*See Id.*, Attachment 5).

**24.** The loss in this case is difficult to approximate in that Tokarek had to rely primarily upon billing records. Tokarek indicated that a "normal" audit would entail an examination of the insured's records.

**25.** Based upon this finding, a two-level enhancement to the base offense level pursuant to U.S.S.G. § 2TB1.1 is warranted. Thus, Gavaraglia's motion for reconsideration on this issue must be denied.