**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Donnie RATLIFF, Defendant–
Appellant.**

**No. 01–6146.**

United States Court of Appeals,
Sixth Circuit.

April 10, 2003.

Before: MARTIN, Chief Circuit Judge; ROGERS, Circuit Judge; and EDMUNDS, District Judge.*

PER CURIAM.

This appeal follows a jury trial and conviction of Defendant/Appellant Donnie Ratliff ("Defendant") for mail fraud in violation of 18 U.S.C. § 1341. Defendant's appeal raises three issues: (1) whether the trial court erred in denying the jury's request to end deliberations for the day; (2) whether the trial court erred in excluding evidence of Defendant's businesses' profits as irrelevant; and (3) whether the trial court erred in sentencing Defendant by applying an enhancement for "more than minimal planning." For the reasons stated below, Defendant's conviction and sentence are AFFIRMED.

## I.

Defendant designed a scheme to trick Kentucky Employers Mutual Insurance Company ("KEMI") into issuing Defendant's trucking company underpriced workers compensation insurance. In 1996, Defendant applied for workers' compensation insurance from KEMI through an independent agent, Ann Ewers. He filled out an application in the name of "Donnie Ratliff Trucking Inc.," and swore that his estimated payroll would be $3,300, that he did not haul coal, and that he would not be using subcontractors or outsourced em-

---

\* The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation.

ployees to perform his hauling. Ms. Ewers submitted the application to KEMI through the mail.

Defendant owned and operated three businesses as a sole proprietor: Cowboy's Truck Service ("Cowboy's"), Donnie Ratliff Trucking ("Ratliff"), and Patrick Trucking. The primary purpose of Cowboy's Truck Service was to service the trucks used in the hauling businesses. The other businesses hauled rock, coal, and a coal industry byproduct called "gob," primarily for Mountain Enterprises and Branham & Baker. At Defendant's trial, the government presented testimony showing that Ratliff provided over $500,000 worth of hauling business to Mountain Enterprises and Branham & Baker. Defendant's customers would hire and pay Ratliff, but Defendant instructed his bookkeeper, Ms. Clevinger, to transfer funds between company accounts every pay period and to pay most of the employees through Cowboy's. As a result, the total payroll paid out of Ratliff for the relevant three years was $25,752.00, and the total payroll paid out of Cowboy's was $424,067.

At the end of the first year of coverage, a KEMI underwriter increased the premium after noting the number of drivers Defendant had disclosed on the application and concluding that the payroll must have been larger than Defendant represented. Defendant complained about the increased premium to Ms. Ewers, and instructed Ms. Clevinger to prepare and sign a letter reaffirming Ratliff's low payroll. KEMI decreased the premium in response to the letter and unemployment records.

Several of Defendant's employees were injured during the period of KEMI's insurance coverage. Prior to their accidents, each had been paid out of the Cowboy's account. Because Defendant did not purchase workers compensation insurance for Cowboy's employees, Defendant directed his bookkeeper to report on the First Report of Injury and the insurance claim form that the employees were employed by Ratliff and that their initial dates of employment with Ratliff predated the injuries. The claims were mailed to KEMI.

KEMI unraveled Defendant's scheme by noticing that there was an unusual coincidence of new hires incurring injuries, that under the previous insurance company's policy Ratliff's claims were "off the charts," and that one injured employee could not produce Ratliff pay records to match his reported work history. KEMI auditors visited the bookkeeper and inspected the bank records of Defendant's companies. KEMI's subsequent audit revealed that Defendant had understated his payroll by almost $400,000, resulting in premium savings of almost $100,000.

Defendant was indicted on four counts of mail fraud, in violation of 18 U.S.C. § 1341, and the jury convicted him of three counts. The district court increased his offense level by two points for "more than minimal planning" and sentenced him to twenty-one months of imprisonment, three years of supervised release, and $97,260.28 in restitution to KEMI.

## II.

### A. Jury Coercion

#### 1. Standard of Review

The Court reviews the trial court's response to a question submitted by a jury for abuse of discretion. *United States v. Reed,* 167 F.3d 984, 989 (6th Cir.1999).

#### 2. Analysis

■ Defendant argues that the district court's response to a jury note requesting to be excused for the evening was coercive, evidenced by the jury reaching a verdict only twenty minutes after the district

court's response. Defendant contends that the court's response to the note created the impression that "it was more important to be quick than to be thoughtful." *United States v. Markey*, 693 F.2d 594, 597 (6th Cir.1982) (citations omitted). Accordingly, Defendant requests a new trial.

"In evaluating for coercive effect a judge's statement to the jury, this Court must consider the statement in context, assessing it under the totality of the circumstances." *Gibson v. United States*, 271 F.3d 247, 258 (6th Cir.2001) (overruled on other grounds, *United States v. Leachman*, 309 F.3d 377 (6th Cir.2002)).

This Court addressed a similar issue in *Gibson*, 271 F.3d at 258–59. There, while dismissing an alternative juror at 4:15 p.m., the district court stated:

> I'm designating you as the alternate juror. You will be excused. This jury is going to be deliberating this afternoon and it appears that you won't be able to do that. And unfortunately I don't have the physical space to let the jury deliberate tomorrow. I have another jury coming in and the grand jury coming in.

*Id.* at 258.

Since the defendant did not object to the comment at trial the court reviewed the district court's action for plain error and found that three factors indicated the statement was not coercive. *Id.* First, the statement was not a charge to the jury, rather it was directed at one juror. *Id.* at 258–59. Second, the statement was made almost three hours before the jury began deliberations. *Id.* at 259. Third, the statement was ambiguous: the jury could have interpreted it as requiring them to either deliberate without a break, or to reconvene after two days if they were unable to reach a verdict that day. *Id.*

The court addressed the same issue in *Markey*, and again reviewed for plain error. In *Markey*, at the close of trial, the district court commented that "the courthouse would be available the following morning (Christmas Eve) if the jury was unable to reach a consensus that afternoon." 693 F.2d at 597. The court held that the District Judge's remarks to the jury were not plain error because they were not "likely to give the jury the impression that it was more important to be quick than to be thoughtful." *Id.*

The circumstances of the disputed instruction in this case are as follows. On the third day of trial, the jury retired to deliberate at 10:14 a.m. At 5:55 p.m. that day, the district judge convened counsel in his chambers to place a note from the jury on the record. The note stated: "Judge Hood We are having great difficulty in hashing out the matter of Mail Fraud and most jurors want to go home and rest and return tomorrow for further deliberation. Would this be acceptable and appropriate if [sic] the deliberation of this case." Judge Hood responded with the following note: "Mr Orrison, I have court scheduled in Frankfort tomorrow so it won't be possible to go home and return in the morning. Please direct your attention to all the instructions, but pay particular attention to instruction number 23." Instruction twenty-three is the district court's standard instruction to the jury to work out their differences. The defense counsel objected to the response because he claimed it amounted to an "Allen charge" even though there was no indication that the jury was deadlocked. *Id.* At 6:15 p.m., the jury delivered its verdict.

The district court's response to the jury's note did not amount to coercion. As *Markey* and *Gibson* establish, a district court's statement regarding the ability of the jury to deliberate on certain days is not necessarily coercive. Moreover, the district court's statement is ambiguous be-

cause the jury could have believed that although they could not deliberate the following day, they could have returned after the weekend.[1] In response to Defendant's argument that the speed of the jury's decision indicates coercion, this court has ruled that the jury's speed in reaching a verdict is irrelevant to whether an instruction was coercive. *See United States v. Giacalone*, 588 F.2d 1158, 1168 (6th Cir.1978) ("The speed with which a jury may reach a verdict following the giving of the charge cannot be considered in determining whether the given charge was improper as coercive when given, although it might tend to indicate whether an instruction deemed improper was or was not harmless."); *United States v. Tines*, 70 F.3d 891, 896 (6th Cir.1995). Therefore, the district court's response to the jury was not an abuse of discretion.

## B. Exclusion of Evidence

### 1. Standard of Review

When considering a trial court's evidentiary determinations, the court reviews conclusions of law de novo, and reviews determinations of fact for clear error. *Reed*, 167 F.3d at 987.

### 2. Analysis

■ At trial, Defendant sought to introduce evidence of his businesses' profitability, but the district court excluded the evidence as irrelevant, pursuant to Fed. R.Evid. 403. On appeal, Defendant argues that since the government introduced evidence of Ratliff's revenue, he should have been able to rebut the inference that he profited from the scheme. In addition to evidence of revenue, however, the government introduced evidence of combined payroll expenses of nearly $450,000. Considered as a whole the evidence did not create an inference of great profitability, as Defendant argues. The district court was not required to allow Defendant to introduce his own evidence of low profitability in order to rebut a nonexistent inference of great profitability.

Moreover, Defendant's businesses' profits during the years in question are not relevant to whether his behavior constituted mail fraud.[2] Financial gain from a fraudulent scheme is not relevant to proving guilt, and the converse is equally true: lack of significant financial gain from a fraudulent scheme is not relevant to showing innocence. Even if a defendant's financial gain from a fraudulent scheme were relevant, the businesses' profits standing alone are irrelevant to whether Defendant benefitted. For instance, in the absence of the fraud, his profits may have been even lower or nonexistent, and thus a small profit margin is not relevant to the scheme's benefit to Defendant. The district court did not err by excluding the evidence as irrelevant.

1. The day the jury deliberated, June 7, 2001, was a Thursday.

2. Section 1341 of Title 18 of the United States Code provides, in part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service ... or takes or receives therefrom any such matter or thing or knowingly causes to be delivered by mail or such carrier according to the direction thereon ... any such matter or thing, shall be fined ... or imprisoned....

shall be guilty of an offense against the United States.

## C. Sentencing Enhancement

### 1. Standard of Review

The court reviews a trial court's sentencing enhancement for more than minimal planning for clear error. *United States v. Lutz*, 154 F.3d 581, 590 (6th Cir.1998).

### 2. Analysis

■ The trial court may increase an offense level by two points if the offense involved "more than minimal planning." U.S.S.G. § 2B1.1(b)(4)(A) (2000). The Sentencing Guidelines define "More than minimal planning" as "more planning than is typical for commission of the offense in a simple form ... 'More than minimal planning' is deemed present in any case involving repeated acts over a period time, unless it is clear that each instance was purely opportune." U.S.S.G. § 1B1.1, cmt. n. 1(f) (2000); *see also United States v. Lewis*, 156 F.3d 656, 659 (6th Cir.1998). " 'More than minimal planning' can be deduced by more planning than is typical, repeated acts, and steps to conceal the crime." *United States v. Ellerbee*, 73 F.3d 105, 108 (6th Cir.1996).

This case involves repeated acts and attempts to conceal the crime. Defendant organized two separate companies for the purpose of defrauding KEMI, instructed his bookkeeper every two weeks to switch money from one to the other to perpetuate the fraud, routinely falsified employment records for injured workers, and when the insurance company tried to correct the underestimated payroll he objected and took affirmative steps to conceal and perpetuate his fraud. Therefore, the district court's finding of more than minimal planning was not clear error. *See, e.g., Lewis*, 156 F.3d at 659 (affirming the district court's finding of "more than minimal planning" where the defendant mailed numerous fraudulent claims to the Medicaid program).

## III.

For the reasons stated above, we **AFFIRM** Defendant's conviction and sentence.