NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0873n.06
Filed: December 20, 2007

Case Nos. 06-5061, 07-5421

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| GARY L. SLATER, | ) | DISTRICT OF KENTUCKY |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |
| | ) | |

BEFORE:    BOGGS, Chief Judge; McKEAGUE, Circuit Judge; and COHN*, District
Judge.

**AVERN COHN, District Judge.**  This is a criminal case.  Defendant-Appellant Gary L. Slater

("Defendant") appeals his convictions for mail fraud under 18 U.S.C. § 1341 and conspiracy to

commit money laundering under 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(h).  Defendant raises

two issues on appeal: (1) whether the convictions must be reversed because the government

failed to introduce evidence sufficient to prove the charges beyond a reasonable doubt, and (2)

whether the district court's denial of Defendant's motion for a new trial must be reversed because

of newly discovered evidence.  For the reasons that follow, Defendant's convictions will be

affirmed.

---

*The Honorable Avern Cohn, United States District Judge for the Eastern District of
Michigan, sitting by designation.

## I. Background

Defendant and his business associate, Bill Johnston ("Johnston"), incorporated Carol-Dale Contracting Company, Inc. ("Carol-Dale"), in November 1997. Carol-Dale was in the business of clearing out equipment from abandoned mines. In October 2001, Johnston secured a workers' compensation insurance policy for Carol-Dale with Kentucky Employers Mutual Insurance ("KEMI"). Johnston and Defendant allegedly misrepresented the number of employees on Carol-Dale's payroll to KEMI in order to reduce the premiums due on the policy.

In December 2001, a Criminal Fraud Specialist from KEMI, Tom Weir ("Weir"), audited Carol-Dale. Carol-Dale raised suspicion at KEMI after reporting a large number of claims relative to its reported number of employees. Based on his investigation, Weir concluded that Carol-Dale had grossly underreported its number of employees. In January 2002, Weir sent a letter stating that Carol-Dale owed KEMI $1.8 million in unpaid premiums. Carol-Dale failed to pay, and KEMI cancelled the policy in February. Following the cancellation, Defendant called Weir, and pursuant to this conversation Weir faxed Defendant a release granting KEMI permission to request documents from the Kentucky Division of Unemployment Insurance in order to verify the size of Carol-Dale's payroll. Weir received no response to this fax.

Defendant then allegedly devised a broader scheme to defraud insurance companies out of workers' compensation premiums. This was done by forming two corporations with similar sounding names, only one of which was insured. The insured corporation would account for only a fraction of the total workforce, while the uninsured corporation would account for the remainder. The names of the entities were similar so that mine owners would not notice the

2

difference when presented with a certificate of insurance bearing the name of the covered entity as proof that employees of both companies were covered for workers' compensation purposes.

Defendant and Johnston initiated the scheme when Johnston incorporated B & G Contracting, Inc. ("B & G Contracting") in January 2002. B & G Contracting was an employee-leasing agency that provided coal miners to coal mining operations on a contract hourly rate basis. A short time later, Defendant incorporated a second company with a similar name, B & G, Inc. ("B & G"). The corporate documents for both entities listed Defendant's former co-worker, Bruce Hurley ("Hurley"), as president.

On February 4, 2002, Defendant, Johnston, and Hurley flew to Pikeville, Kentucky to obtain insurance from KEMI for B & G Contracting. Defendant allegedly hid his identity and posed as Hurley during meetings because KEMI suspected him of fraud and misrepresentation in connection with the Carol-Dale policy. KEMI ultimately refused to extend coverage because it believed that B & G Contracting was simply a continuation of business by Carol-Dale under a new name. However, B & G Contracting was able to secure insurance with American International Group, Inc. ("AIG") on February 20, 2002.

AIG renewed B & G Contracting's policy on February 20, 2003. During an on-site audit conducted about two months later, AIG discovered that when the employees nominally employed by B & G were taken into account, B & G Contracting had grossly underreported the size of its payroll. Consequently, AIG substantially increased the premiums on the B & G Contracting policy and declined to renew the policy at the expiration of the second term.

Johnston formed another corporation, Cumberland Gap Contracting, Inc. ("Cumberland Gap Contracting"), in 2002; Cumberland Gap Contracting obtained workers' compensation

3

insurance from KEMI in February 2004. Defendant then formed a second company, Cumberland Gap, Inc. ("Cumberland Gap") on March 4, 2004. Cumberland Gap was uninsured and was used to hide the majority of the workforce and payroll.

The Kentucky Department of Insurance investigated all four of these corporations after receiving a fraud referral letter from KEMI. The investigation led to searches of Johnston's office, Hurley's home, and Defendant's home. The government seized two computers from Johnston's office, one black ("the black computer") and the other white ("the white computer"). The payroll accounts for both Cumberland Gap and Cumberland Gap Contracting were fully documented in the white computer, while the black computer contained only abbreviated portions of the accounts used for underreporting payroll to the insurance companies. Defendant maintains that he and his wife, Carol Slater, used only the white computer, and that only Johnston used the black computer. Defendant says that his wife used the white computer to manage the company's payroll and organize paperwork.

During its searches, the government also found numerous checks signed by Defendant and made out to Carolyn Gambrel ("Gambrel") or a grocery store that she owned and operated, Gambrel's Food Mart. These checks were drawn on the accounts of two alleged "shell companies," Victory Trucking and Hurley Trucking. Defendant would allegedly transfer the profits realized as a result of the workers' compensation scheme from the contracting companies to the trucking companies. Defendant or Hurley would then write checks to Gambrel or her store on behalf of the trucking companies. In exchange, Gambrel would forge an invoice for goods or services, cash the check, and return the cash less a "handling fee" to Defendant. Defendant

4

maintains that he signed these checks at Johnston's direction and believed the checks were tax payments or insurance premiums.

The government also found hundreds of thousands of dollars in cash in Defendant's house and barn. Defendant maintains that the cash was honestly earned savings, not from any illicit source, and that he kept the money in his house because he distrusted banks.

On March 3, 2005, a grand jury returned a nine-count indictment against Defendant, Carol Slater, Hurley, Johnston and Gambrel. A superseding indictment was returned on May 5, 2005. Defendant entered a not guilty plea on both indictments. Hurley, Johnston, and Gambrel entered into plea negotiations with the government, while Defendant and Carol Slater proceeded to a trial by jury. Following the conclusion of the proofs, the district court denied Defendant's motion for a directed verdict and submitted the case to the jury. The jury returned a guilty verdict on all counts. The district court sentenced Defendant to a total term of 108 months. Defendant timely filed a notice of appeal.

After initiating his appeal, Defendant discovered new evidence that he contends would likely produce an acquittal if he were granted a new trial. Specifically, Defendant says that while incarcerated he met an inmate named Darren Michael Edward Barrett ("Barrett"), who told him that both Hurley and Johnston admitted to giving false testimony at Defendant's trial. Defendant was incarcerated at the Big Sandy Federal Prison Camp in Inez, Kentucky ("Big Sandy"), while Hurley and Johnston were sent to the Federal Prison Camp in McCreary County, Kentucky ("McCreary"). Defendant met Barrett while at Big Sandy. Barrett had previously been imprisoned at McCreary, and told Defendant that while there he had spoken with Johnston and Hurley. According to Barrett, Hurley and Johnston stated that they testified falsely at

5

Defendant's trial for the purpose of reducing their own prison sentences. Hurley has submitted an affidavit denying Barrett's allegations.

Based on his conversation with Barrett, Defendant filed a Motion for a New Trial. The trial court denied that motion in a written opinion and order. The issues of sufficiency of the evidence and newly discovered evidence have been consolidated for appeal.

## II. Sufficiency of the Evidence

### A. Standard of Review

This court reviews *de novo* the district court's denial of Defendant's motion for acquittal on grounds of insufficient evidence. U.S. v. Humphrey, 279 F.3d 372, 378 (6th Cir. 2002). "The standard for evaluating claims that a conviction is not supported by sufficient evidence presents a very difficult hurdle for the criminal appellant." U.S. v. Maxwell, 160 F.3d 1071, 1077 (6th Cir. 1998). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Va., 443 U.S. 307, 319 (1979) (emphasis in original). The court thus "views all evidence in the light most favorable to the prosecution." U.S. v. Talley, 164 F.3d 989, 996 (6th Cir. 1999). "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." U.S. v. Fortson, 194 F.3d 730, 735 (6th Cir. 1999).

In particular, "[b]ecause direct evidence of a defendant's fraudulent intent is typically not available, specific intent to defraud may be established by circumstantial evidence and by inferences drawn from examining the scheme itself which demonstrate that the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension." U.S. v.

6

Winkle, 477 F.3d 407, 413 (6th Cir. 2007) (quoting U.S. v. Yoon, 128 F.3d 515, 523-24 (7th Cir. 1997)). "[T]he question of intent is generally considered to be one of fact to be resolved by the trier of the facts . . . and the determination thereof should not be lightly overturned." Winkle, 477 F.3d at 413.

With respect to the conspiracy charge, "[t]he government need not show that a defendant participated in all aspects of the conspiracy; it need only prove that the defendant was a party to the general conspiratorial agreement." U.S. v. Avery, 128 F.3d 966, 971 (6th Cir. 1997). Moreover, "a defendant's knowledge of and participation in a conspiracy may be inferred from his conduct and established by circumstantial evidence." U.S. v. Martinez, 430 F.3d 317, 330 (6th Cir. 2005).

## B. Mail Fraud

Defendant first argues that his mail fraud conviction was not supported by sufficient evidence because the government failed to establish that he even knew about the insurance fraud scheme, let alone that he devised or intended to devise the scheme. Rather, Defendant argues that the evidence tends to show that he turned over his business affairs to Johnston, played only a small role at Carol-Dale and the other companies, and remained largely unaware of the means by which Johnston procured and paid for the workers' compensation policies. He says that Hurley and Johnston gave the only direct evidence that he had knowledge of the scheme and that both Hurley and Johnston agreed to testify in exchange for a sentencing recommendation. By Defendant's account, the other evidence tending to suggest that he knew about the scheme was merely circumstantial, and the government did not produce any credible evidence that he "knowingly devised" the schemes, an essential element of the mail fraud offense.

7

Taken in the light most favorable to the government, the record contains evidence more than sufficient for the jury to conclude that Defendant possessed the requisite intent to defraud. In large part, Defendant's argument is an attack on Johnston and Hurley's credibility. It is well-settled, however, "that on appeal, there is no place for arguments regarding a government witness's lack of credibility...[i]t is for [jurors] and not for appellate courts to say that a particular witness spoke the truth or fabricated a cock-and-bull story." Talley, 164 F.3d at 996-97.

Moreover, Defendant's argument ignores the testimony of several disinterested witnesses who suggested at trial that Defendant was knowingly involved with the mail fraud scheme. For example, Weir, the Criminal Fraud Specialist from KEMI, testified that he had received several altered documents misrepresenting the size of Carol-Dale's payroll, all signed by Defendant. Additionally, Kathy Nall ("Nall"), an agent of Elite Insurance, testified that she had a meeting with Defendant in Pikeville, Kentucky on February 4, 2002 to discuss obtaining insurance coverage for B & G contracting. Nall testified that during the meeting, Defendant disguised his identity, misrepresenting himself as Hurley. Nall's testimony raises the inference that Defendant was attempting to deceive Nall in order to avoid suspicion, given that KEMI had already cancelled its policy with Carol-Dale.

## C. Conspiracy to Commit Money Laundering

Defendant next argues that the government did not produce sufficient evidence that he knew funds were allegedly being laundered though the shell companies and were the proceeds of unlawful activity. He says that he signed the checks at Johnston's direction and believed that the payments were made in the ordinary course of lawful business.

This argument also fails, as several witnesses gave testimony at trial tending to suggest that Defendant knew that the transactions he carried out made use of funds that were proceeds of unlawful activity. Gambrel's testimony indicated that Defendant himself would often bring in the fraudulent checks for her to cash. Gambrel testified that the "transactions" to which these checks supposedly related were fabricated and that she would create false invoices to conceal the true nature of the arrangement. Hurley and Johnston testified that Defendant knowingly participated in the money laundering scheme. In addition, agents found false invoices hidden in Defendant's barn. Viewed in the light most favorable to the government, the testimony of these witnesses provides ample evidence to support the conviction.

### III. Motion for a New Trial Based on Newly Discovered Evidence

### A. Legal Standard

Pursuant to FED. R. CRIM. P. 33(a), a district judge may grant a new trial "if the interest of justice so requires." "The decision to grant or deny such a motion rests within the discretion of the district court and should not be reversed absent a showing of abuse of discretion." U.S. v. Turner, 995 F.2d 1357, 1364 (6th Cir. 1993). In general, motions for a new trial are disfavored and should be granted with caution. U.S. v. Seago, 930 F.2d 482, 488 (6th Cir. 1991). "No court wishes a defendant to remain in jail if he has discovered evidence showing that he is not guilty, but after a man has had his day in court, and has been fairly tried, there is a proper reluctance to give him a second trial." 3 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 557 (3d ed. 2004).

In order to merit a new trial based on newly discovered evidence, a defendant must establish four elements: (1) that the evidence was discovered after the trial; (2) that the evidence

could not have been discovered earlier with due diligence; (3) that the evidence is material and not merely cumulative or impeaching; and (4) that the evidence would likely produce an acquittal if the case were retried.  U.S. v. Barlow, 693 F.2d 954, 966 (6th Cir. 1982), cert. denied 461 U.S. 945 (1983).

## B.  Analysis

The government concedes that the first two elements of the Barlow test, that the evidence was discovered after the trial and could not have been discovered earlier, are met because the newly discovered evidence did not exist prior to the conclusion of the trial.  Defendant argues the evidence is material, and not merely cumulative or impeaching, because Hurley and Johnston told Barrett that they, and not Defendant, were the sole operators of the scheme.  Accordingly, Defendant says that the evidence tends directly to exculpate him, not merely to undermine the testimony that Hurley and Johnston gave at trial.  Defendant also argues that the evidence would likely produce an acquittal because without Johnston and Hurley's testimony, the government would be unable to prove that Defendant had knowledge of the fraud or money laundering.

Defendant's argument fails because the newly discovered evidence would be very unlikely to produce an acquittal, and Defendant thus cannot satisfy the fourth prong of the Barlow test.  Hurley has submitted an affidavit directly refuting Barrett's affidavit and denying that he ever made the statements attributed to him.  Moreover, there is overwhelming evidence of Defendant's guilt that is completely independent of Hurley and Johnston's testimony.  Weir, Nall, and Gambrel all gave testimony suggesting that Defendant knowingly participated in the insurance fraud and money laundering schemes.  Defendant signed a false employment roster submitted to KEMI.  Investigators discovered hundreds of thousands of dollars in cash hidden in

10

Defendant's house and barn. False invoices were found in the same place as much of the cash. The testimony of Johnston and Hurley tended to corroborate the claims against Defendant, but their testimony was far from the only evidence of Defendant's intent. At best, the newly discovered evidence creates a "conflict in the evidence, but such conflicts do not amount to a likelihood of acquittal." Seago, 930 F.2d at 491.

## IV. Conclusion

For the foregoing reasons, Defendant's claims of error are denied, and the convictions are **AFFIRMED**.

11