*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0297p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 07-5840

HAROLD SIMPSON,

*Defendant-Appellant.*

>

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 07-00050—Joseph M. Hood, District Judge.

Argued: April 22, 2008

Decided and Filed: August 18, 2008

Before: GILMAN, ROGERS, and McKEAGUE, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Kent Wicker, REED WICKER, Louisville, Kentucky, for Appellant. Charles P. Wisdom, Jr., ASSISTANT UNITED STATES ATTORNEY, Lexington, Kentucky, for Appellee. **ON BRIEF:** Kent Wicker, Steven S. Reed, REED WICKER, Louisville, Kentucky, for Appellant. Charles P. Wisdom, Jr., ASSISTANT UNITED STATES ATTORNEY, Lexington, Kentucky, for Appellee.

_____

**OPINION**

_____

ROGERS, Circuit Judge. Defendant Harold Simpson appeals the sentence and order of restitution imposed for his crime of mail fraud. For several years, Simpson underreported payroll information for his businesses to his workers' compensation insurance carriers. The district court concluded that the "loss" caused by this conduct was the amount of additional premiums that the insurance carriers would have charged had they been given accurate information. The court then used those figures to calculate Simpson's Sentencing Guidelines range and the amount of restitution due to the carriers. On appeal, Simpson argues that the proper measure of loss was not the unpaid premiums, but the amount of money that the carriers actually paid on claims. This argument fails, however, because what Simpson took through his deceit was insurance coverage, and the fair market value of that coverage was the amount of the unpaid premiums. We therefore affirm the judgment of the district court.

1

## I.

During the periods relevant to this case, Simpson was involved in the operation of two underground mining companies, Simpson Mining Company and Motivation Enterprise. Simpson was the owner and operator of Simpson Mining, and the vice-president of Motivation Enterprise, which was owned by his wife. Because the companies performed their mining operations in Kentucky, Ky. Rev. Stat. § 342.340(1) required that Simpson maintain workers' compensation insurance for each.

From December 20, 1995 until April 20, 2002, insurance for Simpson Mining was provided by Kentucky Employers Mutual Insurance (KEMI). As with any workers' compensation policy, the size of the premiums due to KEMI depended on the payroll information provided by Simpson Mining, including the number of workers that it employed. Simpson drastically underreported his monthly payroll to KEMI. At one point, for example, Simpson Mining was reporting only fourteen of its forty employees. In the last year of the policy alone, Simpson's fraud enabled him to avoid paying $121,005 in additional premiums.

KEMI did not discover this scheme until September 2001, when one of Simpson Mining's employees attempted to file a workers' compensation claim. Although this individual had been working for the company for approximately nine months, his employment was never reported to KEMI. KEMI consequently cancelled Simpson Mining's policy. A subsequent on-site investigation by the Kentucky Office of Mine Safety and Licensing confirmed that Simpson Mining had a larger workforce and payroll than it had reported to KEMI in monthly payroll reports.

Notwithstanding these developments, Simpson Mining was able to procure immediately a one-year workers' compensation policy from another insurance carrier, Employers Risk Services. Once again, Simpson underreported his payroll information in order to obtain reduced premiums. According to a conservative estimate by Employers Risk Services, Simpson underpaid it by at least $373,326.

When Motivation Enterprise was incorporated in 2004, it too misrepresented the size of its workforce to achieve reduced insurance rates. Over the course of the two years in which it obtained workers' compensation coverage from AIG Global Energy, Motivation Enterprise avoided $1,089,825 in premiums through its falsifications.

In May of 2006, federal officials executing a search warrant for the offices of Simpson Mining and Motivation Enterprise discovered that both companies kept two sets of payroll ledgers. The first ledger for each contained handwritten notes reflecting the amount of cash needed to satisfy its actual weekly payroll. The second contained falsified payroll information that the company sent to its bookkeeping agency. This second ledger significantly underrepresented the size of each company's payroll. Further investigation showed that Simpson paid his employees primarily in cash in order to conceal his fraudulent insurance reporting.

The United States subsequently charged Simpson with mail fraud in violation of 18 U.S.C. § 1341. Simpson pled guilty to that charge and was sentenced by the district court on June 25, 2007. At his sentencing hearing, Simpson objected to the dollar amount of loss that the Presentence Report (PSR) used to calculate his Guidelines range and the size of his restitution order. The PSR figured the amount of loss caused by Simpson's fraud as the additional $1,584,156 in premiums that the insurance carriers would have charged had they received accurate payroll information. Simpson took issue with this methodology, arguing that the unpaid premiums were an improper measure of loss. Because the insurance carriers allegedly received more in premiums than they paid out on claims, Simpson contended that they had not suffered any losses. The district court, however, agreed with the PSR and adopted the loss figures that the PSR recommended.

This decision had a significant impact on the punishment that Simpson received. Because the resulting loss was calculated to be greater than $1,000,000 but less than $2,500,000, the district court applied a sixteen-level increase to Simpson's base offense under the Sentencing Guidelines. *See* U.S.S.G. § 2B1.1(b)(1)(I). The increase resulted in a Guidelines range of 33-41 months, and the district court sentenced Simpson to 36 months of imprisonment. Simpson was also ordered to pay a total of $1,584,156 in restitution to the three insurance carriers, pursuant to 18 U.S.C. § 3663A.

## II.

On appeal, Simpson argues that the value of the unpaid premiums was not the appropriate measure of the loss, and that his Guidelines range and restitution obligations were thus not properly calculated. However, because it was insurance coverage that Simpson stole through his fraud, both calculations were correct.

### A.  Guidelines Calculation

Because the additional amount of premiums that Simpson's carriers would have received but for his fraud represents the "loss" caused by that misconduct for Guidelines purposes, application of a sixteen-level increase to Simpson's base offense was proper. Simpson attempted to take something of substantial value, insurance coverage, without compensating the carriers, thus causing the requisite direct pecuniary loss.

The unpaid premiums fall squarely within the definition of "loss" provided in U.S.S.G. § 2B1.1(b), the relevant Guidelines provision. Where, as here, a defendant commits an offense involving fraud, § 2B1.1(b) requires that his offense level be increased in accordance with the size of the resulting or intended loss. The commentary to § 2B1.1(b) broadly defines "loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense." § 2B1.1 cmt. n.3(A). The commentary then elaborates that "pecuniary harm" means "any harm that is monetary or that otherwise is readily measurable in money." *Id.* Here, Simpson intended to cause "harm that is monetary," that harm would directly "result[] from" Simpson's fraud, and the extent of that harm was "reasonably foreseeable." By attempting to deprive the carriers of compensation for coverage provided, Simpson sought to cause a monetary injury. Such harm is a foreseeable result of the crime intended: the entire point of Simpson's underreporting scheme was to avoid paying the additional premiums.

Moreover, the amount of the unpaid premiums represents the fair market value of the coverage that Simpson sought to obtain. The commentary to § 2B1.1(b) provides that the "fair market value" of the thing taken or destroyed shall be the ordinary determinant of the dollar amount of loss. As this court has observed, fair market value is "the price a willing buyer would pay a willing seller" at the time of the crime. *United States v. Sosebee*, 419 F.3d 451, 456 (6th Cir. 2005). The market value of the insurance coverage is accordingly the amount of the premiums that would have been charged, as that is the price that consumers paid for such protection.

Simpson argues that loss can result from the type of fraudulent insurance reporting that occurred here only to the extent that the amount paid out on claims by the carrier exceeds the premiums that it received. Because the Government offered no evidence at sentencing as to whether Simpson's carriers paid out on any claims, Simpson contends that no loss occurred. Underlying this argument is the idea that the mere provision of insurance coverage confers no value, and that value is conferred only when a carrier actually pays on a claim. However, this contention ignores the fact that, by agreeing to provide coverage, a carrier obligates itself to pay claims arising during the period of coverage, even if those claims exceed the premiums paid. In doing so, the carrier certainly

gives up something valuable. Insurance coverage, by its very nature, is forward-looking, and cannot be valued using the type of after-the-fact analysis advocated by Simpson.

Moreover, and contrary to Simpson's contentions, it is not the case that no "loss" occurs in a case like this if insurance coverage may be cancelled for fraud. At least for Guidelines purposes, it is irrelevant whether, upon uncovering Simpson's fraud and cancelling his policy, a carrier would or would not have been required to pay on claims for injuries pre-dating that termination. Even assuming that Simpson is correct that his carriers would not have been so bound, it appears obvious that Simpson would have directed undeclared workers to his carriers in hopes of evading detection and obtaining coverage. A resourceful employer such as Simpson will attempt to disguise the fact that an employee for whom benefits are sought has not been reported. Where, for example, a policy requires that the employer list the names of the specific individuals for whom coverage has been purchased, an employer may wait to report an employee's existence until the employee is injured, and then explain the discrepancy by claiming, for instance, that the employee is a recent hire. *See United States v. Ratliff*, 63 F. App'x 192, 193-94 (6th Cir. 2003). Indeed, the record suggests that Simpson did direct injured, unreported employees to his carriers, this being the reason for the cancellation of his policy with KEMI. Because Simpson clearly intended to obtain coverage for which he had not paid, he caused "loss," as that term is used in the Guidelines. Under § 2B1.1(b), "intended" loss is adequate to justify an offense level increase even if, for instance, discovery of the fraud precluded actual loss. As the commentary to that section makes clear, "loss is the greater of actual loss or intended loss." § 2B1.1 cmt. n.3(A).

As a final ground for challenging the district court's definition of loss, Simpson claims that the avoided premiums represent consequential damages and thus cannot be used as the measure of loss here. The term "loss" in § 2B1.1(b) does not encompass every harm resulting from a crime, no matter how attenuated the causal link. In accordance with this principle, consequential damages generally are not included in "loss." *United States v. Izydore*, 167 F.3d 213, 223-24 (5th Cir. 1999). However, as the Ninth Circuit concluded in an analogous case, "the loss of premium fees [is] a direct result of fraud and thus [is] not consequential." *United States v. Sanders*, No. 97-10056, 1999 WL 439415, at *1 (9th Cir. June 22, 1999). When an individual underreports his payroll, he is attempting to take coverage directly and thereby to deprive a carrier of premiums directly. It is not as though the district court in this case defined loss to include the additional monies that the carriers could have made by, for example, investing the unpaid premiums. Such a loss would be consequential, but that is not what we have here.

The conclusion that the unpaid premiums represent the loss caused by Simpson's underreporting is further consistent with the purpose of § 2B1.1(b), which is to ensure that a defendant's offense level reflects his culpability. Subsection 2B1.1(b) sets out a table with sixteen ranges of dollar amounts and accompanying base offense level increases. As the amount of money involved in a crime rises, so does the corresponding base offense level. The purpose of these loss gradations is to ensure that, the more harm the conduct at issue threatens, the more severely it is punished. In essence, "[t]he Guidelines use loss as a proxy for the seriousness of the fraud." *United States v. Austin*, 479 F.3d 363, 369 (5th Cir. 2007); *see also United States v. Triana*, 468 F.3d 308, 320 n.8 (6th Cir. 2006) ("the base offense level in fraud cases often does not identify the seriousness of the offense"). When the amount of premiums avoided is used to calculate loss, a defendant's offense level increase is tied to the harm risked. By contrast, there is no link between loss and culpability under Simpson's approach. If loss is determined using the amount of claims paid out, offense level increases are based upon the fortuity of whether employees of a dishonest company become injured. It cannot be, however, that a crime spanning several years and through which $1.5 million was purposefully avoided is not very serious merely because none of the employer's workers happened to get hurt.

Tying offense level increases to the defendant's culpability, in turn, prevents arbitrary disparities in Guidelines ranges. Using unpaid premiums as the measure of loss helps ensure that otherwise similarly situated defendants who intend to, and actually do, fraudulently avoid the same amount of premiums will receive similar Guidelines ranges.

While our court has not previously addressed this issue, our holding is consistent with *United States v. Garavaglia*, Nos. 98-1512, 98-1674, 1999 WL 220125, at *7 (6th Cir. April 6, 1999). In that case we affirmed a district court decision holding that loss should, at least for purposes of restitution, be the amount of avoided premiums. The main issue on appeal there regarding the award of restitution, however, was whether the district court had erred in estimating the dollar amount of the unpaid premiums, and not whether, for purposes of § 2B1.1(b), the measure of loss in a situation such as this should be the value of the unpaid premiums or the amount that was eventually paid out on claims. In an appeal involving the calculation of restitution for a workers' compensation fraud case though, the Seventh Circuit relied on our *Garavaglia* case to support the very reasoning that we adopt here:

> Leahy argues that the Insurance Council does not merit restitution because it received more in premiums than it paid out in claims, so it sustained no loss for restitution purposes. We disagree. The insurance companies were entitled to the benefit of their bargains-the amount of money they would have charged to insure the actual risk that Windy Labor presented. *See United States v. Garavaglia*, 5 F.Supp.2d 511, 520, 522 (E.D.Mich.1998), *aff'd*, 178 F.3d 1297 (6th Cir.1999). Otherwise, Windy Labor would obtain a windfall through its fraud, receiving coverage for greater risks than the amount of premiums merited."

*United States v. Leahy*, 464 F.3d 773, 799-800 (7th Cir. 2006).

The Second and Eighth Circuits have also explicitly upheld base level increases under § 2B1.1(b) (or its predecessor § 2F1.1) calculated using the amount of avoided workers' compensation insurance premiums, although it is not clear that calculation based on claims paid was even advocated in those cases. In *United States v. Stevens*, Nos. 97-1260, 97-1586, 98-1348, 2000 WL 419938, at *4 (2d Cir. April 17, 2000), the carrier's "actual loss" was "measured by the difference between the amount of premiums that the [employer] should have paid but for the fraud and the amount that it actually paid." *United States v. Radtke*, 415 F.3d 826, 843-44 (8th Cir. 2005), is similar. The Ninth Circuit has upheld a similar calculation in a case involving fraudulently obtained vehicle insurance. *Sanders*, 1999 WL 439415, at *1.

Finally, although Simpson's challenge to his Guidelines range is primarily based on the district court's definition of loss, he argues in the alternative that the district court erred in calculating the amount of avoided premiums. Given his poor financial status during the relevant periods, Simpson contends that it is improper to assume that he would have remained in business after 2002, and thus continued to underreport his employees, had he been required to pay the full amount of premiums from the start. It is further speculative to assume, he argues, that the carriers would have continued under the insurance contracts had they known the true state of affairs. These arguments are without merit. The fact of the matter is that Simpson *did* stay in business, that his carriers *did not* discover his fraud initially, and that he *did* continue to cause "loss" to the carriers. It was hardly error for the district court to base its calculations upon what actually occurred, as opposed to what could have happened.

## B. Restitution

Parallel reasoning supports calculating the restitution awards in this case based on the additional premiums that should have been paid. Pursuant to the Mandatory Victims Restitution Act

("MVRA"), defendants such as Simpson who commit certain crimes involving fraud must make restitution to their victims. 18 U.S.C. § 3663A. Where an award is appropriate, the statute requires "restitution to each victim in the full amount of each victim's loss[]." § 3664(f)(1)(A). It is true that the MVRA refers only to "actual" loss, and unlike § 2B1.1 of the Guidelines does not include "intended loss." *United States v. Younes*, 194 F. App'x 302, 317 (6th Cir. 2006); *United States v. Finkley*, 324 F.3d 401, 404 (6th Cir. 2003). But apart from the arguments rejected above, Simpson does not really argue that there has been no actual loss.

Instead, his remaining argument with respect to restitution is that this loss was suffered not by the carriers to whom restitution was awarded, but by the Commonwealth of Kentucky. This is because, he claims, the carriers would have discovered his fraud and simply rescinded the insurance contracts had any undeclared employees filed claims. Upon such a rescission, asserts Simpson, responsibility for the undeclared employees' medical expenses would then have fallen on the Uninsured Employers Fund ("UEF") created by the Commonwealth. In Kentucky, "when there has been default in the payment of compensation due to the failure of an employer to [provide insurance or security]" as required by statute, money from the UEF is used to pay for the care of an ill or injured employee. Ky. Rev. Stat. § 342.760. Because coverage would ultimately be provided by the UEF in the case of an actual claim, Simpson argues that the carriers bore no actual additional risk and thus suffered no actual loss. Effectively, he contends that the carriers provided him with nothing other than a piece of paper that made it appear that he was in compliance with state law, thereby permitting him to stay in business.

Under our reading of Kentucky insurance law, however, it appears that the insurance companies would have to pay on claims submitted by employees of Simpson who were injured on the job even if Simpson had fraudulently misrepresented the number of employees covered. While we have not been directed to Kentucky precedent precisely on point, several considerations lead to this conclusion.

First, Kentucky statutory provisions, while not directly so providing, at least suggest that this is the law. Three provisions, Ky. Rev. Stat. §§ 342.310, 342.335, and 342.990, deal specifically with payroll underreporting and the consequences of such underreporting. Section 342.335 makes it illegal for an employer to "knowingly . . . make[] any false representation, including misrepresentations of hazards, classifications, payrolls or other facts . . . that are designed to cause a reduction in the employer's premium." Section 342.990 then provides for civil fines as well as criminal fines or imprisonment for violation of § 342.335. Nowhere in their treatment of fraudulent reporting do these provisions state that a carrier will not be bound to pay on claims for undeclared workers, something that one would expect had the state legislature intended a departure from the common law principles governing worker's compensation insurance, *see infra*. Indeed, to the contrary, § 342.310(2) strongly suggests that a carrier would be bound in a situation such as this. That section provides that an employer "may be ordered to make restitution for any compensation paid as a result of" such a misrepresentation.[1] § 342.310(2).

Other statutory provisions provide additional support. Under Ky. Rev. Stat. § 342.375, "[e]very policy or contract of workers' compensation insurance . . . shall cover the *entire liability* of the employer for compensation to each employee subject to this chapter" (emphasis added). Then, § 342.365 provides that an insurance policy constitutes a "direct promise" from the insurance carrier to the employee. Courts in other states have concluded that such provisions give employees a right to rely on a policy and thus prevent workers' compensation insurance carriers from denying claims for pre-cancellation injuries because of an employer's fraud. *E.g., Am. Millenium Ins. Co.*

---

[1]The potential for restitution to carriers under § 342.310(2) does not necessarily mean that a carrier suffers no actual loss in a case such as this. There is no guarantee that the violating employer will be solvent.

*v. Berganza*, 902 A.2d 266, 269-71 (N.J. Super Ct. App. Div. 2006) (applying New Jersey law and relying on New York, Iowa, and Pennsylvania cases). Moreover, nowhere in its treatment of policy cancellations does the statutory scheme governing workers' compensation insurance permit a carrier to deny pre-cancellation claims for employer fraud. *See* § 342.340(2).

Statutory provision for the UEF, moreover, does not suggest that the carriers would not be liable for workers' compensation claims based on fraudulently obtained coverage. The UEF is a limited resource and is not "a guarantor that all benefits will be paid for work-related injuries suffered in the Commonwealth." *Whitehead v. Davis*, 692 S.W.2d 801, 802 (Ky. 1985). By statute, the UEF "is applicable only to uninsured situations." *Id.* It is not available "when an employer has . . . provid[ed] a workers' compensation insurance policy or [is] certified . . . as a qualified, self-insured employer." *Id.* at 803. As the Supreme Court of Kentucky has explained, "[t]here is simply no indication of any legislative intent to require the state, through the fund, to guarantee payment of worker compensation benefits from defaulting employers, insolvent insurance companies, *and underinsured employers*." *Id.* (emphasis added). Simpson points to no cases where a carrier has been absolved of responsibility for an injury suffered while an employee was working within the scope of an employer's business simply because the UEF could theoretically pick up the tab.

Second, Kentucky workers' compensation cases involving different types of employer misrepresentations suggest that the carriers in this case bore the risk of insuring the unreported workers. Kentucky courts have, for instance, required workers' compensation carriers to provide coverage where the risk insured was greater than that represented by the employer. For example, a carrier must pay out on claims where an employee is injured performing a task not disclosed to the insurer as long as the employee was engaged in the business operation for which the policy was procured and issued. *Globe Indem. Co. v. Doyle*, 426 S.W.2d 425, 429 (Ky. 1968). In *Globe Indemnity*, the Supreme Court of Kentucky held that a carrier was obligated to pay benefits after an employee was killed while piloting an airplane, even though the employee was listed only as a tractor-trailer driver, because the flight was in connection with the employer's beverage distribution business. *Id.* at 425. This was the case even though the employer knew in reporting the employee as a driver that he intended to use the employee as a pilot, even though the carrier could not have anticipated employees performing such an activity, and even though the price of coverage for aircraft operation was nearly twice that paid by the employer. *Id.* at 426-27. Although *Globe Indemnity* involved a slightly different type of fraud than that involved in the instant action, it was similarly a situation where an insurance company was purposefully tricked into insuring a risk that was much greater than it realized.

The cases that Simpson relies upon to contend that the carriers would not be bound to pay on claims for undeclared workers are not to the contrary. *Davis v. Turner*, 519 S.W.2d 820, 821 (Ky. 1975), for instance, is distinguishable in many ways, not the least of which is the fact that it involved an employer who had procured no coverage whatsoever, so that there was no basis for a carrier to be bound in the first place. *Old Republic Insurance Co. v. Begley*, 314 S.W.2d 552, 554 (Ky. 1958), did hold a workers' compensation carrier not liable, but that case involved an employee who was injured while performing a task entirely unrelated to the employer's business. *Old Republic* was distinguished in *Globe Indemnity*. Section 342.375 requires a workers' compensation policy to cover the entire liability "of the employer." Kentucky courts have interpreted the term "the employer" to mean "the business." *Centertown Garage v. Riger*, No. 2003-CA-001094-WC, 2003 WL 22417237, at *1 (Ky. Ct. App. Oct. 24, 2003). Thus, if an employee is injured while performing a task that is outside the scope of the business named on the policy, § 342.375 plainly would not obligate the carrier to pay out on a claim. As the *Globe Indemnity* court explained in distinguishing cases such as *Old Republic*:

> We do not believe . . . that the legislative intent was to permit a coverage that would extend to certain workmen and not to others . . . who are employed in the same

business.  Our cases have gone only so far as to reject the argument that if the employe[e] is covered at all by the policy . . . , he is covered regardless of what he is doing for the employer, and have held, . . . that he is covered only if he is engaged in the business operation for which the policy was procured and issued.

It is our opinion that when there has been an election to operate under the provisions of the workmen's compensation act[,] the law intends for all eligible employe[e]s to be covered by insurance or employer's self-insurance.  It is the responsibility of the employer and his insurer to see to it that the classifications set forth in the policy are sufficiently comprehensive to include all eligible employees.  *If they do not, one of them may have a remedy against the other, but the employe[e] is covered by the insurance*.

426 S.W.2d at 429 (emphasis added).

Third, Kentucky cases involving a different statutory scheme for mandatory insurance suggest that the carriers bore the risk in this case.  Kentucky courts have refused to allow carriers of compulsory automobile liability insurance to deny third-party claims because of policy-holder fraud.  A provider of automobile liability insurance in Kentucky is obligated to provide coverage to an innocent third party who is injured by the covered automobile even where the policy holder procured coverage through fraudulent misrepresentations.  *Nat'l Ins. Ass'n v. Peach*, 926 S.W.2d 859, 861-63 (Ky. Ct. App. 1996).  This is the law in Kentucky notwithstanding the fact that, at least with respect to non-mandatory types of insurance, a carrier may rescind a policy for fraud or misrepresentation.  *Id.* at 861.

In *Peach*, the insured allegedly reported to his automobile liability insurer that he would be the only driver of a vehicle even though he knew that his brother, who had helped purchase the vehicle, would also be using it on a regular basis.  After the insured's brother hit and killed a pedestrian while driving drunk, the carrier brought a declaratory action, seeking to have the policy declared void.  *Id.* at 860.  While the court was sympathetic to the argument that the carrier would have charged higher premiums but for the insured's fraudulent underreporting, it held that the carrier could not rescind the policy as to the deceased third party.  Such a rescission, the court explained, would frustrate the public policy goal underlying the compulsory liability insurance statute, which is "to protect *the victims*" of automobile accidents.  *Id.* at 861.  In light of that objective and the comprehensive statutory regime for liability insurance, the court found it "difficult . . . to reconcile the existence of an *absolute right to rescind* an insurance policy so as to avoid liability to an innocent third party."  *Id.* at 862.  "Once liability coverage is issued . . . the public is entitled to rely upon it until it is prospectively cancelled . . . ."  *Id.*

The parallels between the statutory schemes regulating automobile liability insurance and workers' compensation insurance suggest that Kentucky courts would treat workers' compensation the same way.  Both schemes require the regulated party to procure coverage for the benefit of a third-party that the policy-holder might injure, and each makes such coverage compulsory and continuous.

Fourth, the law of other jurisdictions appears generally to be that a workers' compensation carrier is bound to pay on claims filed by fraudulently unreported employees.  *See Liberty Mut. Ins. Co. v. Borsari Tank Corp. of Am.*, 139 F. Supp. 641, 644 (S.D.N.Y. 1956), *rev'd on other grounds*, 248 F.2d 277 (2d Cir. 1957); Nev. Rev. Stat. § 616B.033(2); *Am. Millennium Ins.*, 902 A.2d at 270; *State Ins. Fund v. Brooks*, 755 P.2d 653, 657 (Okl. 1988); 9 A. Larson & L. Larson, Larson's Workers' Compensation Law § 152.01, pp. 152-2 to 152-3 (2008); 100 C.J.S. *Workers' Compensation* § 691 (2008).

Fifth and finally, it is not unfair as a policy matter to hold carriers responsible in a situation where an employer has engaged in deception, because carriers can take several steps to protect their interests. Before an injury occurs and a claim is filed, a carrier may prevent any future liability by exercising its right to audit insured employers. *See United States v. Slater*, 258 F. App'x 810, 812 (6th Cir. 2007). Through such investigations, the carrier can ensure that an employer's actual workforce matches the figures that it has reported. Indeed, in this case, such a measure may have uncovered Simpson's fraud much earlier. If fraud is detected, the carrier can prospectively cancel the policy. The carrier could also seek an award of restitution for claims paid on a fraudulently obtained policy, Ky. Rev. Stat. § 342.310(2), or attempt to obtain the payment of the unpaid premiums, *cf.* Slater, 258 F. App'x at 812.

For all of these reasons, it appears that the carriers bore the risk of workers' compensation coverage for the unreported workers in this case, and that the underpayment of premiums thus caused actual loss to the carriers. The district court's restitution order was therefore proper.

## III.

For the foregoing reasons, we affirm the sentence and order of restitution imposed by the district court.